# EXHIBIT  D

COPY

1

2

3

4        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

5             IN AND FOR THE COUNTY OF ALAMEDA

6        BEFORE THE HONORABLE HARRY R. SHEPPARD, JUDGE

7                   DEPARTMENT NO. 511

8                      ---oOo---

9    CORNELIUS LOPES and TERESA LOPES,

10                    Plaintiffs,          No. HG06-260161

11        vs.

12   FREMONT FREEWHEELERS, et al.,

13                    Defendants.
                                                      /
14   _____/

15

16        REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

17             TUESDAY, JULY 17, 2007

18                      ---oOo---

19             HAYWARD HALL OF JUSTICE

20               HAYWARD, CALIFORNIA

21

22

23             A P P E A R A N C E S

24   For the Plaintiffs:       PATRICIA A. TURNAGE
                                Attorney at Law
25
     For the Defendants:       DAVID I. DALBY
26                             DAVID L. WINNETT
                               Attorneys at Law
27

28        REPORTED BY:  CINDY A. MORENO, CSR No. 4178

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TUESDAY, JULY 17, 2007**

**PROCEEDINGS**

---oOo---

**THE COURT:**  We're on the record outside the presence of the jury.

Plaintiff has filed a motion to amend the complaint, adding three additional causes of action plus a prayer for punitive damages.

I have reviewed the moving papers and the opposing papers that have been filed this morning, and I have reviewed those.

Is there further argument by either side on this issue -- on these issues?

**MS. TURNAGE:**  Well, Your Honor, it seems that one of the focuses of the defendants is the litigation privilege, and the cases that I have quickly read that they have provided to the Court have to do with defamation and also whether or not the proceedings are protected.  And I would agree that any statements that were made by the cyclists in the criminal trial are privileged.  Plaintiffs do not quarrel with that. But the authorities that they have provided to the Court are not on point with what we have here.

The -- um, the authorities did not elicit the e-mails from the cyclists.  They basically volunteered them at a time that they clearly knew that no one knew how that accident happened.  And someone even allowed the statements of -- that my client punched a cyclist purporting to be an eyewitness, and there was no eyewitness to this.  There has

1    been no evidence or testimony in this trial as to an

2    eyewitness of this accident, and to allow -- Jason Sage

3    testified that he had a copy of the police report, and he knew

4    that those facts were not true, and yet they went ahead and

5    allowed Mr. Lopes to be prosecuted.

6         And from that, a jury could infer malice, which then

7    does not protect the speech and the conduct of the defendants.

8    And the case that the defendants relied upon, which was

9    *Beroiz*, B-E-R-O-I-Z, *versus Wall*, and it's a 2000 Cal App 2d

10   District Court case, I believe it's found at 84 Cal App 4th

11   485, is not on point because it clearly says that it has to be

12   made in good faith and without malice. Otherwise, the

13   protection of privilege is not afforded.

14        And the fact that the statements in the e-mails to

15   the police were -- had some connection or logical relationship

16   to the crimes that were being charged, that Mr. Lopes was

17   being charged with is not sufficient; and that is, um, *Rothman*

18   *versus Jackson*, 49 Cal App 4th 1134, upon which the defendants

19   relied in opposition to this motion. And the Court is saying

20   that similarity to litigation is not enough to have the

21   privilege attach.

22        And the other cases that they rely on, *Deaf Audio,*

23   *Inc., versus Rosen, Feldmire and Sisman*, 47 Cal App 4th 777,

24   has to do with defamation and absolute privilege for

25   publication or broadcast made in any legislative, judicial, or

26   other proceeding authorized by law. That case is similarly

27   not applicable to this motion.

28        The rest of plaintiffs' arguments are set forth in

1   plaintiffs' motion.  And the plaintiffs would ask to direct

2   the Court's attention to *Sandoval*, which is almost on all

3   fours of this case, where the bar patrons knew that the

4   defendant in a criminal proceeding was not clearly to be

5   prosecuted, and they continued to prosecute, allow that person

6   to be prosecuted; and the Supreme Court reversed and said the

7   malicious prosecution had been stated.

8           In this case, the unsolicited e-mails from the -- to

9   the District Attorney through the police is evidence of the

10  plan for the cyclists to continue prosecution.  We're not

11  focusing on the initial statements, but the fact that they

12  voluntarily, and without being asked, put together e-mails and

13  sent those to the police, urging the police to send them to

14  the District Attorney and have my client prosecuted, would be

15  the factual evidence that is before the jury as to malice.

16          And then Mr. Sage also testified about he had been

17  in touch with the District Attorney six times, and I think the

18  jury can infer from that what they will as to why he was in

19  touch with them.  He certainly is a paralegal.  He knows the

20  ins and outs of criminal -- of the law and the burdens of

21  proof, and I have set that forth in plaintiffs' papers.

22          **THE COURT:**  All right.  Mr. Dalby?

23          **MR. DALBY:**  Actually, Mr. Winnett is going to handle

24  the argument, Your Honor.

25          **THE COURT:**  All right, Mr. Winnett.

26          **MR. WINNETT:**  Thank you, Your Honor.  I'll try to

27  confine my comments to those made by Ms. Turnage this morning.

28          We do believe that our opposition brief largely

1    states the argument that we would hope to make here today.

2    And I acknowledge that Ms. Turnage has not had a full

3    opportunity to read the three cases that we had submitted this

4    morning.

5            Respectfully, I disagree with Ms. Turnage as regards

6    to the *Beroiz* case, B-E-R-O-I-Z, 84 Cal App 4th 485.  In that

7    case, as in many of the cases I read last night, there is a

8    comparison of the absolute litigation privilege with a

9    qualified litigation privilege.  And this case, like the Lopes

10   case we're trying currently, determined that the absolute

11   litigation privilege applied to testimony or statements that

12   the defendants gave to criminal authorities who were

13   conducting criminal investigations.

14           I have highlighted the pertinent passages on Page 8

15   and 9 of the opinion.

16           But essentially, what this case is about is people

17   in Mexico suing other people in Mexico, in a California court,

18   and there was a question of the defendants having made reports

19   to Mexican authorities of alleged criminal activity by the

20   plaintiffs.  And the question was, does a Mexican court

21   provide the same -- a Mexican criminal investigation and court

22   proceeding provide the same constitutional protections that

23   are afforded by a criminal proceeding in the state of

24   California?

25           We contend that all of the constitutional safeguards

26   provided by California courts were afforded to Mr. Lopes.  He

27   went through a criminal trial before a jury of his peers.  He

28   was cloaked in the requirement that he be proven guilty beyond

1    a reasonable doubt.  Because those constitutional safeguards

2    were in place, the absolute litigation privilege applies to

3    the conversations that the members of the bicycling club had

4    with one another and with the police prior to the institution

5    of the criminal charges.  This case is right on point.

6              As for Ms. Turnage's repeated statement not only

7    today, but throughout her brief, that Mr. Sage testified there

8    were no eyewitnesses to the event, it's like she's been in a

9    different trial, Your Honor.  We outlined all of the witnesses

10   who were direct eyewitnesses within our brief: Mr. Geisert,

11   Mr. Chuck, Mr. Parker, Mr. Upthegrove, and, most recently,

12   Mr. Rosa, who watched the entire thing happen right in front

13   of him.

14             Plaintiffs' arguments seem to be based on the idea

15   that the criminal complaint against Mr. Lopes charged him with

16   punching someone.  It doesn't.  I grabbed my exhibits last

17   night as I was going through this motion.  The criminal

18   complaint is Defendants' Exhibit 531, and the charges against

19   Mr. Lopes are that he committed a battery in that he willfully

20   and unlawfully used force and violence upon the person of

21   Lloyd Rath and willfully and unlawfully used force and

22   violence upon the person of Bob Parker.  That isn't dependent

23   upon a finding that there was a punch.  He ran into them.

24   That's force and violence.

25             So I just don't understand how plaintiff tries to

26   say, because Officer Wren recorded that one witness who didn't

27   testify in this courtroom claims to have seen a punch, means

28   that this was all fabricated, I don't know where that comes

1  from.  I respectfully submit that that is an absolute

2  misstatement of the witness -- the evidence that has gone

3  before this jury.

4          The remaining two points, Ms. Turnage refers to the

5  e-mails that Mr. Sage provided to the police as being, quote,

6  "unsolicited," end quote.  But Officer Wren testified very

7  clearly yesterday that he arrived at that scene, there were

8  dozens of witnesses, there were people all over the place; and

9  that instead of staying there and interviewing each of those

10 people individually to get their statements, he asked Mr. Sage

11 to get them and send them to him.  They were solicited.  And

12 then later, the District Attorney asked Officer Wren to get

13 these statements.  So they were solicited both by Officer Wren

14 and by the DA.  So the idea that they were unsolicited simply

15 is not the evidence.

16          And finally, as to Ms. Turnage's point about

17 Mr. Sage having been in contact with the DA six times and that

18 somehow this six times speaking with the DA is evidence of

19 some conspiracy, Mr. Sage testified that much of the reason he

20 had to speak with the DA on those occasions was purposes of

21 scheduling, when is the preliminary hearing going to be, those

22 kinds of things.  So six conversations between Mr. Sage, who

23 is speaking on behalf of 15 to 20 different bicyclists, is not

24 unreasonable given the circumstances and certainly does not

25 rise to the level of outrageous conduct or anything else that

26 Ms. Turnage would have this Court believe.

27          Thank you.

28          **THE COURT:**  Anything further, Ms. Turnage?

1    **MS. TURNAGE:**  Yes, Your Honor.

2         In the supplemental investigative report in the

3    police report, Officer Wren testified yesterday that the

4    District Attorney asked him to interview the person who was

5    punched, and he testified that he talked with Bob Parker.  And

6    then I asked him about the confusing statement that he had in

7    the supplemental report, because he stated that he had

8    interviewed Bob Parker, and then he said that he reiterated

9    what the other witnesses had said, that my client had struck

10   the cyclist in the chest with his arm, and that went to the

11   District Attorney in the supplemental report.

12        So there was that statement from the witnesses that

13   was used to send to the District Attorney, that was

14   inaccurate.  There was no -- there is absolutely no evidence

15   that Mr. Lopes struck anyone with his arm before he felt the

16   helmet of Mr. Parker come into his face.  There is evidence

17   that he was coming up and that he, himself -- or Mr. Chuck

18   testified that he did a high five, and Mr. Chuck was able to

19   avoid him, but that can very well be a defensive maneuver.

20   That is not anything that is indicative of personal attack.

21        And I disagree that battery and the charges that

22   were read in the complaint in the criminal proceeding are not

23   from the District Attorney's misunderstanding, through the

24   statements of other witnesses, that my client punched someone

25   out there and with his arm knocked somebody in the chest.

26   There is absolutely no evidence of that in this trial.

27        And that is what I'm speaking to, about there was no

28   eyewitness to this battery, supposed battery, because there

1   wasn't a battery.  This was a clear accident.  Through all of

2   the witnesses, we have established that Mr. Lopes was running

3   10 feet from the curb prior to the race and 10 feet from the

4   curb in the inner lane after the race and 10 feet from the

5   curb in the collision.  And everyone knew in that bicycle club

6   that the accident happened in my client's lane at the time

7   that these cyclists had forgotten he was there, and they broke

8   out and came to the right and struck him head on.

9          And to allow -- to sit back and allow this man to,

10  quote, "get a fine and some light jail time," end of quote, to

11  cover their rear ends so they don't get sued in a civil

12  action, that is exactly what the *Sandoval* case is talking

13  about.  The bar patron, they were concerned that the bar

14  patron was going to sue them in a civil lawsuit.  And the

15  *Sandoval* case, the Supreme Court case said that is enough to

16  find malice -- that there is some reason to bring this man to

17  justice in a criminal proceeding other than to bring him to

18  justice.  There is another motive.

19         And I submit that the evidence in this case has

20  clearly shown that the cyclists had another motive beyond just

21  wanting to see Mr. Lopes going to justice.  They were upset

22  their friends were hurt in a bicycle race, they are mad that

23  he was on the course.  But they understood that they had the

24  power to stop the race and to ask him to leave, either to stop

25  him from running or ask the police to come in, and they didn't

26  do it, and they understood that they were at fault for that.

27  And that is the motive that they had in seeing it through,

28  that Mr. Lopes would be criminally prosecuted.

1    **THE COURT:** I'll be back and we'll recess for a few

2    moments while I read some of my notes.  I'll be back in about

3    10 minutes, 15 minutes.

4    **(Recess taken.)**

5    **THE COURT:** All right.  We're on the record, outside

6    the presence of the jury.

7    The Court has reviewed the briefs and the

8    authorities submitted by counsel in support of the motion to

9    amend the complaint and in opposition to the amendments to the

10   complaint, and listened to the arguments of counsel.

11   The Court's ruling is as follows, and I'll give it

12   in pieces:

13   Regarding the intentional infliction of emotional

14   distress, there has to be outrageous conduct.  Outrageous is

15   defined by the case law.  It has to be conduct that is

16   completely outside the norms of normal decency.  It's just not

17   conduct that's grossly negligent.  It must be beyond that in

18   order to qualify for IIED.

19   In part, the same applies to NIED.  The plaintiffs

20   are also seeking to amend the complaint to add a cause of

21   action for malicious prosecution.

22   This is not a case where there is a citizen's

23   arrest.  I don't understand the plaintiffs' arguments and

24   statements that there were no eyewitnesses to this case.  The

25   basis for that sort of escapes me.  I just briefly reviewed my

26   notes.

27   Mr. Rosa said he saw the defendant with his arm

28   extended.

1        Mr. Baldwin saw Mr. O'Hara go out to the plaintiff,

2    and then he came back to the cyclists and reported what the

3    defendant had said -- excuse me -- what the plaintiff had

4    said.

5        Mr. Grusis was a rider who said he saw the defendant

6    with his arm extended, and I can't remember if it was he or

7    somebody else who gave the demonstration of the angle of his

8    arm.

9        Mr. Selzer testified to the hostile attitude of the

10    plaintiff.

11        Mr. Zuerlien, who was a marshal, advised the

12    plaintiff to get off the course, and there was a hostile

13    response, and his second comment was he was just trying to

14    keep things safe.

15        Mr. Czeszynski told the plaintiff to use the

16    sidewalk.

17        Mr. Rath, Raft or Rath -- I'm not pronouncing it

18    correctly.  I think it's R-A-F-T -- was in the race

19    immediately behind Mr. Parker.  He saw what happened to

20    Mr. Parker.

21        Mr. Upthegrove stated he -- or he heard somebody

22    say, "Runner, right."

23        There certainly is a lot of eyewitnesses to this

24    case.  And one might have to understand the difference between

25    direct and indirect evidence or direct and circumstantial

26    evidence, but there is certainly eyewitnesses to this case.  I

27    didn't go through all the witnesses.  Those are the ones that

28    I just perused.  So the comment that there was no

1    eyewitnesses, I don't understand that.

2            The Court denies the motion to amend the complaint.

3    The Court finds that the conduct of the defendants in this

4    case was not so outrageous as to rise to the level of

5    outrageous conduct that is defined by case law.

6            Regarding the malicious prosecution, this is not a

7    citizen's arrest.  I see -- in this day and age, we should

8    encourage people to submit reports to the police and District

9    Attorney, and not discourage them.  I find nothing in the

10   record to justify or to find that there was bad faith in

11   having cyclists who were at the scene, who participated in the

12   race either as participants or as helpers, like marshals and

13   people that were there for set-up, to submit reports to the

14   police who then sent the reports to the District Attorney.

15           The procedural safeguards were in place in this

16   case.  The police did not make an arrest at the scene because

17   the event didn't occur in their presence.  The police

18   submitted the reports to the District Attorney.  The District

19   Attorney made the decision that there was probable cause to

20   justify an arrest and prosecution.

21           I cannot find that the conduct of the defendants was

22   malicious, as that term is used in the law, and was in bad

23   faith.  On the contrary, I find that they were there to submit

24   to the police and to the authorities what they observed.  And

25   that should be encouraged, and not discouraged.

26           For the foregoing reasons, the Court denies the

27   motion to amend the complaint.

28           As an editorial comment, I see this case as maybe

1    more simple than is being presented in this courtroom.   The

2    issue in this case, as I see it, is were the race officials

3    negligent?   That is, did they exercise or not exercise

4    reasonable care in allowing the race to begin when they knew a

5    runner was on the course?   That's the issue.   Of course, was

6    that conduct -- or if it was not reasonable care, was that a

7    substantial factor in the injuries that were -- that the

8    plaintiff incurred?

9         And the corollary is, was the plaintiff exercising

10   reasonable care when he continued to run on the course under

11   the circumstances that he knew at the time?   And those

12   circumstances are that there was a pack of at least 30

13   bicyclists that he saw before the race actually started and at

14   least five laps had expired.   So that means they went by the

15   runner at least five times.   And they were pedaling quite

16   rapidly.   It was obvious they were pedaling quite rapidly.   So

17   to consider there was not a race is a little bit difficult for

18   me to understand.

19        But then there is other factors.   There was the

20   hostile attitude that was testified to about the plaintiff in

21   this case.   There was the comments that were made by the

22   marshals.

23        So the issue really, as I see it, is:   Were the race

24   officials exercising reasonable care when they allowed the

25   race to begin, and was that -- if they did not, was this a

26   substantial factor?   And was the plaintiff comparatively

27   negligent in continuing to run when he knew or should have

28   known that there was a race in progress?   And was his -- if he

1  knew or should have known, but continued to run, nevertheless
2  continued to run, was his conduct a substantial factor in the
3  injuries that he sustained?
4            Those are the issues as I see it.
5            The rest of these matters are interesting, but I
6  think the case is longer and more difficult than I think the
7  real issues are in this case.
8            The jury has buzzed?
9            **THE COURT ATTENDANT:**  Yes.
10           **THE COURT:**  Are they all assembled?
11           **THE COURT ATTENDANT:**  They are all here.
12           **THE COURT:**  We'll bring them in a little bit early,
13 then.  Let's bring them in at 10:25.
14           **MS. TURNAGE:**  My witness is coming at 10:30.
15           **THE WITNESS:**  I am right here.
16           **MS. TURNAGE:**  Oh, thank you.
17           **THE COURT:**  Do you need time to talk to your
18 witness?
19           **MS. TURNAGE:**  Just maybe briefly.
20           **THE COURT:**  Bring them in at 10:30 then.
21                    **(Recess taken.)**
22          **(Proceedings continue; not transcribed.)**
23                    ---o0o---
24
25
26
27
28

15

1  STATE OF CALIFORNIA )

2  COUNTY OF ALAMEDA   )

3

4

5

6          I, CINDY A. MORENO, an Official Court Reporter of

7  the Superior Court of the State of California, in and for the

8  County of Alameda, do hereby certify that the foregoing is a

9  full, true, and correct transcript of my shorthand notes of

10  the testimony and proceedings had in the above-entitled

11  matter; and that said transcript includes all rulings, acts,

12  instructions or statements of the Court, also all motions,

13  objections or exceptions of counsel, and all matters to which

14  the same relate.

15

16          IN WITNESS WHEREOF, I have hereunto set my hand

17  July 16, 2008.

18

19

20

21                    _____

22          CINDY A. MORENO, CSR No. 4178

23

24

25

26

27

28